1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4    UNITED STATES OF AMERICA        §    CASE NO. 4:24-CR-00253-4
                                      §    HOUSTON, TEXAS
5    VERSUS                          §    FRIDAY,
                                      §    MAY 17, 2024
6    LORENZO JACKSON                  §    10:11 A.M. TO 11:54 A.M.

7

8            **ARRAIGNMENT AND DETENTION HEARING**

9            BEFORE THE HONORABLE CHRISTINA BRYAN
                UNITED STATES MAGISTRATE JUDGE

10

11       APPEARANCES:                    SEE NEXT PAGE

12

13

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22               Sugar Land, TX 77478
                     281-277-5325
23             www.judicialtranscribers.com

24

25      Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4   UNITED STATES OF AMERICA        §     CASE NOS. 4:24-CR-253-1
                                     §               4:24-CR-253-3
5   VERSUS                           §               4:24-CR-253-5
                                     §     HOUSTON, TEXAS
6   KENNETH KELLEY                   §     FRIDAY,
    KE SHAUN JOHNSON                  §     MAY 17, 2024
7   NYREON TUCKER                    §     10:11 A.M. TO 11:54 A.M.

8                 **ARRAIGNMENT AND DETENTION HEARINGS**

9
              BEFORE THE HONORABLE CHRISTINA BRYAN
10                 UNITED STATES MAGISTRATE JUDGE

11

12        APPEARANCES:                    SEE NEXT PAGE

13

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 Eldridge Road, #144
22                 Sugar Land, TX 77478
                      281-277-5325
23              www.judicialtranscribers.com

24
         Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

1                          **APPEARANCES**:

2

3    FOR THE PLAINTIFF:              U.S. ATTORNEY'S OFFICE
                                     Lisa Marie Collins
4                                    1000 Louisiana St., Suite 2300
                                     Houston, TX  77002
5                                    713-567-9000

6

7    FOR DEFENDANT JACKSON:          LEWIS THOMAS LAW PC
                                     Lewis Ashton Thomas
8                                    4550 Post Oak Pl. Dr., Ste. 118
                                     Houston, TX  77027
9                                    281-513-9880

10   FOR DEFENDANT KELLEY:           FEDERAL PUBLIC DEFENDER
                                     Philip Gallagher
11                                   440 Louisiana St., Suite 1350
                                     Houston, TX  77002-1056
12                                   1-713-718-4600

13   FOR DEFENDANT JOHNSON:          ATTORNEY AT LAW
                                     Winifred Akins Pastorini
14                                   440 Louisiana, Suite 200
                                     Houston, TX  77002
15                                   713-236-7300

16   FOR DEFENDANT TUCKER:           LAW OFFICE OF JUDITH SHIELDS
                                     Judith Irene Shields
17                                   10655 Six Pines Dr., Suite 230
                                     The Woodlands, TX  77380
18                                   936-703-5002

19

20

21

22

23

24

25

1                                    **INDEX**

2

3    WITNESS:                    Direct      Cross      Redirect      Recross

4    JOE OPPEDISANO
      By Ms. Collins            16          .          .             .
5     By Mr. Gallagher          .           42         .             .
      By Ms. Pastorini          .           49         .             .
6     By Mr. Thomas             .           63         .             .
      By Ms. Shields            .           70         .             .
7

8
      EXHIBITS:                             Marked     Offered       Receive
9
      (None offered.)
10

11

12                                      **\*\*\***

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **HOUSTON, TEXAS; FRIDAY, MAY 17, 2024; 10:11 A.M.**

2          THE COURT:  Do we have all counsel present for the

3    next detention hearing?

4          MS. SPEAKER:  Yes, Your Honor.

5          THE COURT:  Are we missing Ms. Prater or --

6          MS. SPEAKER:  Mr. Gallagher's --

7          THE COURT:  You're standing in for Ms. Prater?

8          MR. GALLAGHER:  Oh, I'm sorry.  Yes, Your Honor.

9          THE COURT:  Okay.  All right.  Do we have room at

10   the table for all of the Defendants?

11         MR. GALLAGHER:  I can --

12       (Attorneys discuss seating arrangements.)

13         THE COURT:  And are all Defendants going forward

14   with their detention hearings?

15         MR. GALLAGHER:  Yes, for Mr. Kelley.

16         MS. SHIELDS:  Yes, for Mr. Tucker.

17         MR. THOMAS:  Yes, for Mr. Jackson.

18         MS. PASTORINI:  And, yes, for Mr. Johnson.

19         THE COURT:  Okay.  Actually let me have everybody

20   up front because they all need to be arraigned.  So let's do

21   -- can we have Mr. Kelley --

22         MR. SPEAKER:  Kelley.

23         THE COURT:  -- here.

24         MR. SPEAKER:  Kelley.

25         THE COURT:  Mr. Johnson next.

1          MR. SPEAKER:  Johnson.

2          THE COURT:  Mr. Jackson after that.  And then

3 Mr. Tucker.

4          MR. SPEAKER:  Johnson.  This is Kelley, yes.

5          MR. SPEAKER:  Your Honor, you don't have anything

6 else until 2:00 o'clock; is that right?

7          THE COURT:  After this detention hearing we do not

8 have anything until 2:00 o'clock.

9          There was a request to start the new arrest docket

10 early so that people who were here -- there's a very thin

11 staff at Pretrial Services, and so there was a request to

12 start early.  I don't know if the Marshals have --

13          MS. SPEAKER:  We haven't confirmed it yet.

14          THE COURT:  Okay.  So just --

15          MR. SPEAKER:  I'll be around.

16          THE COURT:  Yeah, be ready to start early if that

17 happens.

18          Okay.  First of all, I've got Mr. Kenneth Kelley,

19 Mr. Ke Shaun Johnson, Mr. Lorenzo Jackson, and Mr. Nyreon

20 Tucker, correct?

21          ALL DEFENDANTS:  Yes, ma'am.

22          THE COURT:  Okay.  Each of you has a copy of the

23 Indictment, correct?

24          ALL DEFENDANTS:  Yes, ma'am.

25          THE COURT:  And each of you has had the

1    opportunity to talk with your attorney about the charges

2    that have been brought against you in the Indictment,

3    correct?

4              ALL DEFENDANTS:  Yes, ma'am.

5              THE COURT:  And have you had the opportunity to

6    ask any questions about the charges against each of you in

7    the Indictment?

8              SOME DEFENDANTS:  Yes, ma'am.

9              THE COURT:  I need everybody to answer out loud.

10             ALL DEFENDANTS:  Yes, ma'am.

11             THE COURT:  All right.  Counsel, all counsel, do

12   you waive a formal reading of the Indictment?

13             MR. GALLAGHER:  Yes, for Mr. Kelley.

14             MS. PASTORINI:  Yes, for Mr. Johnson.

15             MR. THOMAS:  Yes, for Mr. Jackson.

16             MS. SHIELDS:  Yes, for Mr. Tucker.

17             THE COURT:  All right.  And I thoroughly reviewed

18   all of the charges with each Defendant at their initial

19   appearance.

20             Mr. Kelley is charged in Counts Three, Four, Five,

21   Six, Nine, Ten, Eleven, and Twelve.  Those are all counts of

22   either interference with commerce by robbery, in violation

23   of 18 U.S. Code, Section 1951(a) and Section 2, or a charge

24   of using and carrying a firearm during and in relation to a

25   crime of violence.

1          Mr. Johnson is charged in Counts One, Two, Three,

2  Four, Five, and Six.  Again, those are all one of the two

3  charges, either interference with commerce by robbery or

4  using, carrying a firearm during and in relation to a crime

5  of violence.

6          Mr. Jackson, you are charged in Counts Nine, Ten,

7  Eleven, and Twelve.  Again, those are all counts of the same

8  -- one of two of the same charges, interference with

9  commerce by robbery or using and carrying a firearm during

10  and in relation to a crime of violence.

11          Mr. Tucker, you're charged in Counts Seven and

12  Eight, which is one count of interference with commerce by

13  robbery, one count of using and carrying a firearm during

14  and in relation to a crime of violence.

15          The interference with commerce by robbery charges

16  carry a maximum sentence per count of up to 20 years in

17  prison, a fine of up to $250,000, three years on supervised

18  release.  And there's always a $100 mandatory special

19  assessment.

20          All of the charges of interference with commerce

21  by robbery carry a minimum sentence of five years in prison,

22  up to life in prison, a fine of up to $250,000, up to three

23  years on supervised release and, again, the $100 mandatory

24  special assessment.

25          Does everyone understand what you are charged with

9

1   and what the minimum and maximum statutory penalties are if

2   you are convicted?

3            SOME DEFENDANTS:  Yes, ma'am.

4            THE COURT:  I didn't hear you, Mr. Tucker.

5            DEFENDANT TUCKER:  Yes, ma'am.

6            THE COURT:  All right.  Are you ready to enter

7   your formal plea to the charges in the Indictment,

8   Mr. Kelley?  And for you, that would be charges Counts

9   Three, Four, Five, Six, Nine, Ten, Eleven, and Twelve?

10           DEFENDANT KELLEY:  Not guilty.

11           MR. GALLAGHER:  Yes.

12           THE COURT:  All right.  We're entering a not

13   guilty plea on your behalf.

14           Mr. Johnson, are you ready to enter your formal

15   plea to the charges in Counts One, Two, Three, Four, Five,

16   and Six?

17           DEFENDANT JOHNSON:  Yes, ma'am.

18           THE COURT:  And what is your plea, sir?

19           DEFENDANT JOHNSON:  Not guilty.

20           THE COURT:  We're entering a not guilty plea on

21   your behalf.

22           Mr. Jackson, are you ready to enter your plea with

23   respect to Counts Nine, Ten, Eleven, and Twelve?

24           DEFENDANT JACKSON:  Yes, ma'am.

25           THE COURT:  And how do you plead, sir?

1              DEFENDANT JACKSON:  Not guilty.

2              THE COURT:  We're going to enter a not guilty plea

3   on your behalf.

4              Mr. Tucker, are you ready to plead to the counts

5   in -- to the charges in Counts Seven and Eight?

6              MR. TUCKER:  Yes, ma'am.

7              THE COURT:  And how do you plead, sir?

8              MR. TUCKER:  Not guilty.

9              THE COURT:  All right.  We're going to enter a not

10  guilty plea on your behalf also.

11             The case is assigned to Judge Bennett.  You are

12  set for trial on July 22nd of 2024 at 9:00 a.m.  Your

13  motions are due by June 3rd, responses by June 13th.

14             Your proposed voir dire and jury charges are due

15  by July 11th.  And your pretrial conference is set for

16  July 18th at 2:30 p.m.

17             Is anyone waiving speedy trial at this point?

18             MR. GALLAGHER:  Not for Mr. Kelley.

19             MS. PASTORINI:  Not at this time for Mr. Johnson.

20             MR. THOMAS:  No, Your Honor, for Mr. Jackson.

21             MS. SHIELDS:  No, not at this time for Mr. Tucker.

22             THE COURT:  Okay.  And, Ms. Collins, how many days

23  do you estimate for trial?

24             MS. COLLINS:  Five to seven, Your Honor.

25             THE COURT:  Okay.  All right.  Everyone can have a

1  seat at counsel table.  We'll --

2          MR. GALLAGHER:  Your Honor, is it okay -- the

3  Government said it's fine, we -- Mr. Kelley and I can sit

4  here, and then the other six folks can sit there so --

5          THE COURT:  Okay.

6          MR. GALLAGHER:  -- we can fit.  Okay.  Thank you.

7          THE COURT:  That's fine.

8      (Mr. Gallagher/Defendant Kelley confer.)

9      (Court takes up another matter from 10:18 a.m. to

10  10:19 a.m.)

11          THE COURT:  All right.  I think I'll ask counsel

12  how you prefer to do it.  Would it -- I mean, obviously

13  there's going to be some information that applies to every

14  Defendant.  There may be information that applies to a

15  particular Defendant.

16          It might be more clear to -- after you give me the

17  information or you elicit the testimony regarding a

18  particular Defendant, we might want to allow for

19  cross-examination with respect to that information at that

20  time.

21          Or do you think it's going to be more clear to

22  just do -- put on all your evidence and then allow each

23  individual counsel --

24          MS. COLLINS:  Well, --

25          THE COURT:  -- an opportunity for cross?

1              MS. COLLINS:  Your Honor, should we get to my

2   witness, I think it would probably be best because there's

3   just so much interplay between the cases.

4              THE COURT:  Okay.

5              MS. COLLINS:  That having been said, pursuant to

6   3142(e)(3), I will reserve comment pending the burden of

7   production by defense counsel on the presumption.

8              THE COURT:  So are you telling me you're not going

9   to present any evidence?

10             MS. COLLINS:  Your Honor, this is a presumption

11  case as it contains multiple 924(c) charges.  I do have a

12  witness ready should that burden be overcome by defense

13  counsel, but --

14             THE COURT:  Well, part of what defense counsel to

15  do -- can do to overcome the burden is cross-examine the

16  witness who's presented.

17             MS. COLLINS:  I understand that, Your Honor.

18  Nevertheless, I believe that it is their burden of

19  production and persuasion.

20             THE COURT:  All right.  So, all right.

21             Mr. Gallagher?

22             MR. GALLAGHER:  So as to -- I think just legally

23  the Court understands the burden --

24             THE COURT:  It --

25             MR. GALLAGHER:  To overcome the burden is quite --

1   is a --

2          THE COURT:  It's a low burden.

3          MR. GALLAGHER:  Essentially.  And obvious the

4   Court can still consider than when making its determination

5   and its decision.

6          THE COURT:  Correct.

7          MR. GALLAGHER:  But to overcome the burden takes

8   just almost nothing legally.

9          THE COURT:  Well, I don't know if I would say

10  almost nothing.  There has to be some evidence presented --

11         MR. GALLAGHER:  So --

12         THE COURT:  -- to overcome the danger to the

13  community and the risk of flight.

14         MR. GALLAGHER:  And so --

15         THE COURT:  And that evidence --

16         MR. GALLAGHER:  I'm sorry.

17         THE COURT:  -- can be in the form of testimony

18  from a witness called by the Government.  If, you know, if

19  you can elicit testimony, that would meet the burden.

20         MR. GALLAGHER:  To overcome the presumption

21  regarding risk of flight, Mr. Kelley's connections to the

22  community are clear from the pretrial report.

23         He's lived his whole life here.  His family

24  members are here.  There's no evidence of him having

25  connections anywhere else or any means to go anywhere else.

1  So regarding risk of flight, I don't think there's any

2  question about the burden.

3              Regarding danger to the community, --

4              THE COURT:  Can -- before you continue, I'm just

5  going to take judicial notice of all the information

6  contained in all of the Pretrial Services reports.  And that

7  includes the information you've just given me about

8  Mr. Kelley's contacts with the community.

9              Go ahead, Mr. Gallagher.

10             MR. GALLAGHER:  And then as far as danger to the

11 community, I'll note that Mr. Kelley has never been

12 convicted of a prior offense.

13             He has been -- since the time of this he's been in

14 custody so there's been no failures to appear, no violations

15 of bond conditions on this or in any other matters.

16             He is a young person who, as we said, has -- well,

17 I will proffer one thing that I have -- I'm not clear why

18 Pretrial wasn't able to make contact with his mother.

19             I have spoken with his mother.  He has a place to

20 stay.  She will serve as a third party custodian.  So that

21 willingness to do so I think also overcomes the burden, as

22 well as the conditions that this Court can set involving

23 close confinement, ankle monitor, home confinement, which

24 has never been applied to Mr. Kelley before.

25             And so that also shows that the Court has means at

1  its disposable -- at its disposal to overcome the danger to

2  the community, Your Honor.

3          THE COURT:  Thank you, Mr. Gallagher.

4          We can continue in this fashion or we can --

5          MS. COLLINS:  Your -- and I'm not trying to be

6  difficult.  I assure you that is not my goal here at all.  I

7  just think obviously this is a presumption case and so --

8          THE COURT:  I understand --

9          MS. COLLINS:  -- I'm allowing for that.

10          THE COURT:  -- it's a presumption.  I understand

11  they all have the burden.  But it is a low burden.  The case

12  law is clear, it's a low burden.

13          MS. COLLINS:  And --

14          THE COURT:  And I think, you know, taking judicial

15  notice of the information in the reports, you know, there is

16  evidence in the record certainly to address as to each

17  Defendant their ties to the community.

18          And, based at least in part of the fact that each

19  of these Defendants is about 19 years old, there may --

20  although there are many arrest charges with respect to each

21  Defendant, we don't have convictions yet.  So --

22          MS. COLLINS:  With --

23          THE COURT:  -- you know, it is possible that that

24  information can overcome the presumption.

25          MS. COLLINS:  With that in mind, Your Honor, then

1    I will call Joe Oppedisano to the stand.

2                THE COURT:  All right.  Thank you.

3                THE CLERK:  Raise your right hand.

4            JOE OPPEDISANO, GOVERNMENT'S WITNESS, SWORN

5                THE COURT:  You may proceed, Ms. Collins.

6                MS. COLLINS:  Yes, Your Honor.

7                            DIRECT EXAMINATION

8    BY MS. COLLINS:

9    Q    Could you please state your name for the record?

10   A    Joseph Thomas Oppedisano.

11   Q    And if you wouldn't mind spelling the last name for us.

12   A    O-P-P-E-D-I-S-A-N-O.

13   Q    Where do you currently work?

14   A    I work for the FBI as a Special Agent.

15   Q    And do you have a specific assignment?

16   A    Yes.  I'm on the Violent Crimes Task Force in Houston,

17   Texas.

18   Q    All right.  Do you also work at something commonly know

19   as the TAG?

20   A    Yes.

21   Q    And what is that?

22   A    It's the -- it's basically the -- it's the Texas

23   Against Gangs unit, if you want to call it.

24   Q    All right.  And what does that mean; what do you --

25   what are you able to do at that location?

1  A    We work with State and local partners who are on task

2  force with the FBI to combat violence and within the Houston

3  AR.

4  Q    All right.  Based on that, do you commonly work with

5  members of the Houston Police Department?

6  A    Yes.

7  Q    All right.  In the case that we're here for today, did

8  you become alerted to a series of aggravated robberies

9  occurring in the Houston area?

10  A    Yes.

11  Q    Can you tell us how you first came into contact with

12  this case, how you first became aware of it?

13  A    One of my partners, who's a Houston PC task force

14  officer on my squad, notified me that there was a bunch of

15  Uber/Lyft robberies that were occurring almost every other

16  day.  And they were trying to combat against stopping that

17  as quick as they possibly could.

18  Q    Okay.  You said a series of Uber or Lyft robberies.

19  Can you tell us the basic MO or what was occurring in each

20  of these robberies?

21  A    Yes.  So when it was brought to my attention, it was

22  between two to three unknown Black males would take a

23  rideshare or have a rideshare sent to a location where the

24  rideshare driver would then pick them up.

25        As soon as they depart, within matter of minutes or

JOE OPPEDISANO - DIRECT BY MS. COLLINS                    18

1   moments, firearms were be pulled out, and then they would be

2   robbed at gunpoint for either cash on them, cellphones,

3   debit cards.

4        If they can get debit cards, then they would then take

5   them to ATMs where they could take out money, cash off of

6   that or have them transferred to Cash App accounts.

7        In some instances there was -- they were threatening

8   the victims -- they would threaten the victims.  In some

9   instances there -- they would use force against the victims.

10       They used sexual assault against one of the victims,

11  and basically held against their will until they release

12  them from whatever timeframe they wanted to.

13  Q    All right.  And so to be clear, as these suspects were

14  going around using the debit cards and things like that,

15  where were the victims during that period of time?

16  A    The victims were inside the vehicle with the subjects.

17  Q    All right.  In total how many of these types of

18  robberies did you find connected to this group that seemed

19  to be committing these similar robberies?

20  A    Approximately 19 incidences ranging between the

21  beginning of April of 2023 until the end to middle of June

22  of 2023.

23  Q    All right.  Now obviously not every single one of these

24  robberies is in the Indictment.  If we could just go one by

25  one for the individuals that we have present today, could

1  you give the Court an idea, for instance, with regard to

2  Lorenzo Jackson, of those 19, how many does law enforcement

3  currently have him connected to?

4  A    Approximately five.

5  Q    And with regard to Nyreon Tucker, about how many of

6  these do we have him connected to?

7  A    Approximately three.

8  Q    And with regard to Kenneth Kelley, how many of these do

9  we have him connected to?

10  A    Approximately eight.

11  Q    And with regard to the last, Ke Shaun Johnson, how many

12  is he connected to of these robberies?

13  A    Approximately five.

14  Q    All right.  I want to just kind of go through those

15  cases that were chosen for the Indictment.  Can you give us

16  an idea -- kind of go one-by-one through each of the counts?

17  A    Sure, yeah.

18  Q    And give us just an idea of the underlying facts of

19  each of those offenses.

20  A    Sure.  Just bear with me.  There's a lot of cross-

21  between the Uber and Lyft cases.  I want to make sure I get

22  the facts accurate.

23        So on May 24, 2023, a Uber female rideshare driver

24  picked up three unknown Black males at a location within

25  Houston.

1    When she picked them up, soon as they proceed to drive

2  off, a pistol was taken out and presented towards the victim

3  and demanded money, currency, debit cards, things of that

4  nature.

5    They also utilized a transfer to a Cash App which was

6  later identified where money was then sent to in order to

7  help basically give the currency over to them in the

8  electronic form.

9    After a little bit of time of trying to get the -- any

10  debit cards or anything of that nature, they ended up

11  releasing the victim, and they took off on foot.  And then

12  that was that incident.

13    That incident that we have so far, Ke Shaun Johnson was

14  present during that based off of the photo array for -- that

15  was shown to the victim in that instance.

16    May 29th incident was a Lyft female driver who picked

17  up three unknown Black males, same MO as I described.  They

18  all got in the vehicle.

19    And then shortly after the ride, they left, a pistol

20  was then presented to the victim, at that time demanding

21  cash, cellphones, debit cards, things of that nature where

22  the cellphone was taken in this instance.

23    Some cash and belongings were taken as well, personal

24  belongings like AirPods and stuff like that.

25    They -- once they could not get any other -- any more

1    money or belongings, they departed on foot and left that

2    location as well, and left her stranded without a phone

3    because they had taken the phone at that time.

4         Kenneth Kelley was present based off of the name, off

5    of the rideshare that was requested, which was KK, who we

6    learned through the investigation is his name that he goes

7    by, he's -- like an alias.

8         There's cellphone presence.  His cellphone presence for

9    Kenneth Kelley was potentially there at the sites.

10        The photo array was -- for Kenneth Kelley was also

11   shown and he was picked out of that photo array.

12        And then there was a video of himself and Ke Shaun at a

13   pawnshop pawning in the -- some of the belongings that were

14   taken from that one instance.

15   Q    And let me pause you right there.  You stated that in

16   that encounter, AirPods were taken; is that correct?

17   A    Yes.

18   Q    And was that one of the items that was then pawned at

19   the local pawn store?

20   A    Yes.

21   Q    All right.  And you mentioned -- we've mentioned Ke

22   Shaun a couple of times now.  In the course of this

23   investigation did he become kind of know, if you will, by

24   the nickname of "Blue Jacket Guy?"

25   A    Yes.

JOE OPPEDISANO - DIRECT BY MS. COLLINS                22

1  Q    And why is that?

2  A    Because at the -- one of the ATMs, he was wearing the

3  blue jacket sweatshirt, hoodie that he used to cover his --

4  disguise himself as he went to the ATM.

5  Q    All right.  Did he wear this on not just one but

6  several different robberies that were -- that occurred

7  during these 19 -- this 19-robbery spree, if you will?

8  A    Yes.

9  Q    And specifically you mentioned that most commonly when

10 these robberies took place, they were holding the victim in

11 the car, going around to different ATMs to use the debit

12 cameras.

13      Were you all able to actually go back and obtain the

14 video surveillance from many of those ATMs in this case?

15 A    Yes, we were on many of them, not all of them.  Just

16 based off of the -- due to the nature of us finding out

17 which ATM it was after the investigation, there's a

18 timelapse between the time we find out and what time when it

19 gets written over.

20 Q    Sure.  In multiple cases with regard to Ke Shaun, was

21 he wearing that blue hoodie literally in a camera where you

22 could see his face?

23 A    Yes.

24 Q    And was that one of the easy ways to identify him in

25 the five different aggravated robberies we have him

1   connected to?

2   A    Yes.

3         MS. COLLINS:  All right.  I believe that you were

4   discussing 5/29.  Let me also just back up while we're

5   talking.

6   Q    After -- at the end of this investigation, after you

7   were able to identify the individuals you believed were

8   involved, did you and others subpoena the phone records for

9   each of these four Defendants?

10  A    Yes.

11  Q    Were you then able to go back -- let me actually

12  clarify that, for three of these four.  Nyreon Tucker you

13  did not receive phone records for; is that correct?

14  A    Yes, we did not.

15  Q    All right.  For the three that you did, did you all go

16  back and do tower-mapping to see if you can place these

17  individuals at the scenes of the varying offenses?

18  A    Yes.

19  Q    A moment ago when you said that the phones -- I believe

20  it was Kenneth Kelley -- placed him at the scene, is that

21  what you were referencing?

22  A    Yes.

23  Q    All right.  And you mentioned that it was Kenneth

24  Kelley and Ke Shaun that were seen pawning those AirPods; is

25  that correct?

1  A    Yes.

2  Q    All right.  And I know I interrupted you.  Were you

3  done with the March 29th incident?

4  A    I was just finishing up on how Ke Shaun also had his

5  cellphone presence, picked out of a photo array that was

6  given to the victim, and he was also obviously on the

7  pawnshop video as like I said moments ago.

8  Q    All right.  Moving on to the next incident, can you

9  take us through that?

10 A    Yes.  This was June 3rd, 2023.  It was a female Uber

11 rideshare driver picked up two unknown Black males.  The

12 rideshare name that came across was KK again, same as the

13 previous one.

14     The two males get out into the backseat.  And they

15 obviously pulled out another firearm and did the same

16 typical MO where they would demand money, cash, debit cards

17 of that nature.

18     The difference was on this one there was a sexual

19 assault that occurred with the victim.  During the course of

20 the robbery, the subject moved the female into the front

21 passenger seat while one of the subjects drove and the other

22 one still stayed in the back.

23     Come to find out that it was Kenneth Kelley in the

24 backseat, Ke Shaun Johnson was driving.  The female driver

25 is -- she's gay and she was asked if she liked men.  And she

1  had proceeded tell them that she's gay, she does not like

2  men.

3       And in that time she turned around and Kenneth Kelley

4  turned and told her, well, let's -- something to the effect

5  of, I don't care, let's -- let me try and change that for

6  you and, at gunpoint, proceeded to force her to perform oral

7  sex on him while Ke Shaun drove the vehicle to various ATMs

8  to try and take out more cash.

9       She did not know where she was obviously because she

10 was performing oral sex so she couldn't get her bearings on

11 where she was until she got up.  And even then she didn't

12 know where she was.

13      To try and get out of the situation, she made some

14 excuses that, you know, she can't have sex or she can't do

15 this to then turn around and try and push that off even

16 further so they would stop.

17      And then eventually they took the cash and went to some

18 ATMs and then left her and fled on foot again.

19      Present was going to be, like I said, Kenneth Kelley.

20 The rideshare name again was KK.  Cellphone presence was

21 near some of the sites.  And then obviously the photo array

22 was given to the victim who then picked out KK, Kenneth

23 Kelley.

24      Ke Shaun had a photo array as well, the ATM video.  And

25 during his interview, he places himself at the scene of --

1  during the interview with law enforcement and explains how

2  he did not sexually assault her, and then basically alludes

3  to Kenneth Kelley being present for that.

4  Q    All right.  And just to be super clear, at the time

5  that this rideshare driver was forced to perform oral sex,

6  was that at gunpoint?

7  A    Yes.

8  Q    Furthermore, did she make it quite clear in multiple

9  interviews that she did not want to perform oral sex on

10  either of these men?

11  A    Yes.

12  Q    In the interview where Ke Shaun Johnson places himself

13  in the vehicle, does he admit that there was some form of

14  sexual intercourse occurring between Kenneth Kelley who he

15  names and IDs and this rideshare driver?

16  A    Yes.

17  Q    And, again also to be clear, is this sexual assault

18  taking place literally while they are still driving around,

19  stealing her money as well?

20  A    Yes.

21  Q    All right.  Continuing on to the next robbery that's

22  included in the Indictment.

23  A    Yes.  That's June 7th, 2023, and that is a Uber

24  rideshare male who picked up three unknown Black males with

25  the rideshare name Nyreon.

1     Again, same MO.  They get in the vehicle, they start to

2   depart the location that they were picked up at, and a

3   pistol was then presented to them -- to the victim where

4   they demanded cash, told them that, you know, if you move,

5   we'll kill you, just comply with us, things of along that

6   nature to intimidate the victim.

7     The -- they rode around trying to get some more cash

8   and whatever else they can get while holding him at

9   gunpoint.

10    The victim at that point turned around and did not want

11  to -- he wanted to try to defend himself, so he grabbed the

12  weapon and pushed it, raised it -- he grabbed a hold of the

13  front of the weapon of the barrel and raised it to the top

14  of the roof of the car.

15    In the midst of the struggle, he stepped on the

16  accelerator and crashed into a vehicle.  At that time,

17  that's when the subjects got out of the vehicle and departed

18  the location on foot.

19  Q    All right.  How are we able to link the individuals

20  that are charged in the Indictment to that robbery?

21  A    Nyreon Tucker, oh, is previously on bond and had a

22  ankle monitor on that was GPS-located.  So going back and

23  getting the GPS data was easier to show where he was during

24  that time.

25    Photo array, he -- Nyreon Tucker was picked out of

1    during when the victim was shown that.  And the rideshare

2    name was Nyreon, which then from the grand jury subpoena

3    gave the information that he provided to the rideshare

4    company when he first started the Uber account, you want to

5    call it.

6    Q    All right.  And I want to kind of pause you there.  You

7    mentioned that Nyreon Tucker had an ankle monitor on.  Are

8    you familiar with what type of case he was charged with at

9    the time that he committed this robbery?

10   A    Yes.

11   Q    Can you tell us what it was?

12   A    I don't have the facts of the case.  I just know that

13   it was aggravated robbery to I believe a Walgreens, and that

14   he was placed on an ankle monitor for that incident.  And

15   then that's all I know for that.

16   Q    Fair enough.  And with regard to that count, you

17   mentioned Nyreon Tucker's involvement in it.  Can you go

18   through and discuss Lorenzo Jackson's involvement in that?

19   A    (No audible response.)

20   Q    And I am flying without any computer or any of my notes

21   so (indiscernible) --

22   A    To my knowledge --

23   Q    -- at any time.

24   A    To my knowledge, Lorenzo Jackson was not on that one.

25   He's not part of that count.

1   Q    Okay.  Can you move us on to the next one?

2   A    Sure.  June 13, 2023 --

3   Q    Actually, let me -- I did misstate who was involved in

4   that.  Can you tell us about Brian Dorsey's involvement?

5   A    Yes.

6        MS. COLLINS:  Actually, you know what, let's just

7   save that for when he's in front of us.

8   Q    All right.  Moving along to the next robbery.

9   A    June 13, 2023, it was another -- it was a Lyft

10  rideshare driver, a male, picked up three unknown Black

11  males, same MO again.

12       Again, the vehicle, pistol to the back of his head or

13  to the side of his head, I can't recall.  And they moved the

14  -- they moved this victim to a different part of the

15  vehicle.  And then one of the unknown subjects drove that

16  vehicle.

17       They drove around and, you know, same MO, asked for

18  wallet, cellphones, try and transfer debit cards, things of

19  that nature.

20       And then turned around and during the testimony, we

21  didn't know this until we interviewed the victim, but

22  according to him, they drove to two different locations and

23  robbed two other individuals or companies, not warehouses,

24  like a lawn service company and I can't recall the other

25  one.

1       And then they left those scenes with the victim still

2   present, being held at gunpoint, and then drove to the next

3   location where they ended up going to some ATMs.  And they

4   took out approximately $3500 from the combined ATMs.

5       And then they drove to the neighborhood where they

6   wanted to get dropped off at, and they basically told him

7   that if he notify the police, they would kill him.  And then

8   they left and departed the location and left him by himself.

9       Present for a photo array and cellphone presence was

10  Kenneth Kelley.  And then Lorenzo Jackson for cellphone

11  presence and photo array.

12  Q   All right.  Was there sort of an aggravated robbery

13  that occurred that sort of led to what I would call I guess

14  the break in this case?

15  A   Yes.

16  Q   And can you tell us about that?

17  A   That would be when Kenneth Kelley was arrested in the

18  last incident that I'm about to talk about, vehicle, stolen

19  vehicle the following day after the incident.

20  Q   All right.  And I'm jumping ahead of you.  Can you talk

21  to us about the original robbery that occurred and then the

22  eventual location of Kenneth Kelley in that vehicle?

23  A   Yes.  That was on June 20 of 2023.  It was another

24  rideshare Uber.  Female driver picked up three unknown Black

25  males, same MO, took out a pistol, wanted -- demanded cash,

1  money.

2      This Uber driver did really have too much to give or

3  offer.  They drove around for a while trying to get her to

4  give money or have people transfer money to her.

5      Eventually they ended up at a gas station where she was

6  still driving and Kenneth Kelley is seen on video getting

7  out of that vehicle, going into the convenience store, going

8  back and forth.

9      I believe he was trying to access the ATM.  I'm -- but

10  I can't be certain on that.  But he's going in and out of

11  the store back and forth to the vehicle.

12      At some point in time during the -- them sitting there,

13  obviously there's two more unknown males in the vehicle that

14  are sitting there with the victim so she doesn't drive away

15  or leave.

16      She decides to just get up, get out of the vehicle, and

17  go into the convenience store and lock herself in the

18  bathroom.  That's when you see Kenneth Kelley come out and

19  get in the driver seat.

20      And then that's when you also see on video camera

21  Lorenzo Jackson get out of the back right seat with a

22  handgun in his hand and get in the front seat.  They depart

23  the location.

24      And then if you fast-forward to the next day, Kenneth

25  Kelley and another male who was identified are up the block

1  at the gas station or convenience store with that vehicle.

2      Marked units were on the lookout for a stolen vehicle.

3  They came across this during their just routine

4  investigation, looking for that vehicle.  They find it at

5  the store.

6      And then they performed to try and take then into

7  custody.  And during that time, the individuals looked to

8  get out of the car and they proceed to try and flee on foot.

9  Q    And let me be very clear.  Was Kenneth Kelley one of

10  the individuals who attempted to flee from law enforcement?

11  A    Yes.

12  Q    Was he caught there at the scene?

13  A    Yes.

14  Q    When they -- after they had detained the individuals

15  that were in the stolen vehicle, were they able to do a

16  search of the vehicle?

17  A    Yes.

18  Q    Can you tell us what, if anything, they found inside

19  the vehicle?

20  A    They found the handgun.

21  Q    What was that?  I'm sorry.

22  A    Handgun.

23  Q    And do you recall if that was a loaded handgun or not?

24  A    I do not recall off the top of my head.

25  Q    Okay.  Before we move on, once Kenneth Kelley was

1  arrested, was he found to have a phone on his person?

2  A    Yes.

3  Q    Were we able to get a warrant for that phone, and have

4  you had a chance to review the contents of that phone?

5  A    Yes.

6  Q    All right.  And I'm not going to put you on the spot.

7  There was a lot of data on the phone; is that fair?

8  A    Yes.

9  Q    Have you had a chance to review at least some parts of

10  that data?

11  A    Yes.

12  Q    Great.  With regard to that, were you able to find

13  where Kenneth Kelley was either messaging other individuals

14  to pick up Uber or to order Ubers or ordering them himself?

15  A    Yes.  It was a female.  The name escapes me at the

16  moment.  But he was asking her to order him rides, and then

17  alluded to make sure that let me know what -- let me see a

18  picture of them before you ordered it so I can basically vet

19  them to see if they're somebody that's going to be easy to

20  rob or not.

21      And he used the word "stick," which from my training

22  and experience working violent crime is referencing a

23  weapon, a firearm.

24  Q    All right.  In addition, are there actually texts where

25  he is telling people he's ordered the Uber and for them to

1  come meet him?

2  A    Yes.

3  Q    Specifically off the top of my head were at least one

4  of those texts to Lorenzo Jackson here in the courtroom with

5  us today?

6  A    Yes.

7  Q    All right.  Eventually were Ke Shaun, Lorenzo, and

8  Nyreon also arrested by law enforcement?

9  A    Yes.

10  Q    And I want to go just one-by-one through their arrests.

11  With regard to Ke Shaun Johnson, can you tell us the

12  particulars of his arrest by law enforcement, specifically

13  FBI and HPD?

14  A    So, yes, we were doing -- that day we were trying to

15  take down multiple subjects for this incident.  So I was not

16  present for his actual arrest.  I was not there.

17      From -- but from my understanding, when he was found by

18  our TFO partners, he was I believe with his father.  And

19  they were at a fishing pier or trying to fish when he was

20  apprehended by his -- with him in the vehicle, or the

21  vehicle they drove in.

22  Q    All right.  And if you recall, did he drive there with

23  his father or separately?

24  A    From my understanding with his father.

25  Q    All right.  After Ke Shaun Johnson was arrested -- and

1  I guess to be fair to him, there wasn't any struggle, he

2  didn't resist, or anything like that?

3  A    No.

4  Q    All right.  After he was arrested, did they have a

5  chance to look inside of his vehicle?

6  A    Yes.

7  Q    And can you tell us what they found there?

8  A    A handgun that was on the floorboard.

9  Q    And if you recall, was it on the driver's side

10 floorboard, passenger floorboard?

11 A    I believe it was on the backseat passenger floorboard

12 behind the driver, if my memory serves me correctly.

13 Q    All right.  And that gun was found in the same vehicle

14 that he had driven there with his father for fishing.

15 A    Yes.

16 Q    All right.  With regard to Lorenzo Jackson, can you

17 tell us the particulars -- I believe you were actually at

18 that scene --

19 A    Yes.

20 Q    -- of that day and that arrest?

21 A    Yes.  So I was at that scene.  Originally we were going

22 to go there and do what we typically do to arrest somebody

23 in the morning.

24     We -- when we got there, we noticed that there was a

25 lot of movement in and out of the house, family members or

1  people we just didn't know.  So we wanted to sit there on

2  surveillance just so we can assess who's coming and going.

3       And if he leaves, Lorenzo Jackson, then we can just

4  traffic stop him, so it would just be a lot easier than

5  going to the house.

6       Lorenzo was on the phone, and he was in and out of the

7  house.  At that point, what we believed -- and we don't have

8  it because we never recovered it, but from what we can see

9  it looked like he had a firearm in his pants or hooded

10 sweatshirt area.

11      And he was on his phone when he got into a vehicle with

12 another male driver.  They drove actually past me, made a

13 righthand turn off of his block and onto a subsequent block,

14 where then he was followed by another vehicle that was part

15 of our operation.

16      As soon as they made a quick left, they stopped that

17 vehicle.  And there was only one male inside, the driver.

18 And Lorenzo Jackson was not present.  So he had fled on

19 foot.

20      We don't know which direction he went in at that time

21 so we set up a perimeter and started calling more units to

22 try and apprehend Lorenzo Jackson from fleeing.

23      When some time had passed, we did not -- we could not

24 locate him.  Myself and couple other FBI agents approached

25 the house to try and talk to some of the other people that

1  were outside, which we came in contact with his mother, his

2  sister, and then there was a bunch of relatives and friends

3  that were hanging around.

4      We -- I disclosed some of the information of what's

5  going on with the incidences and how we need to get in touch

6  with Lorenzo, we need to talk to him.

7      We have an arrest warrant for him on the State side and

8  we need to -- for him to come in and let's have a talk or

9  see what his side of the story is to get some cooperation.

10 His mother assured me that he was going to cooperate and --

11 Q    Let me kind of pause you right there because there's a

12 lot of information.

13 A    Sure.

14 Q    Backing up just a little bit, with the law enforcement

15 that was there at the scene for the arrest warrant, was

16 anybody able to see what happened from the time he left in

17 the vehicle until the time the vehicle was stopped?  In

18 other words, did anybody see him get out of the vehicle?

19 A    Nobody saw him get out of the vehicle because we wanted

20 to create a little bit of space until the marked units got

21 up to where we were in order to initiate the traffic stop on

22 that vehicle.

23     So we didn't want a foot pursuit or a car chase, so our

24 unit that was -- the lead unit that was following that

25 vehicle created some distance in order for the marked units

1   to show up.

2        And by the time the marked units got there, he -- the

3   -- he had already left, jumped out of the vehicle.

4   Q    Nevertheless, did law enforcement still talk to the

5   driver of that vehicle?

6   A    Yeah.  And at first he did not want to cooperate, said

7   there was nobody in the vehicle, which obviously we were on

8   surveillance so we watched him get inside the vehicle.

9   But --

10  Q    Did he -- go ahead.

11  A    Then he eventually cooperated and said, yeah, there was

12  a second person in the vehicle with me.

13  Q    Okay.  And did he tell law enforcement where that

14  person went?

15  A    He just said he got out and ran.

16  Q    All right.  You mentioned that you were talking to the

17  Defendant's mother or Lorenzo's mother there at the scene;

18  is that right?

19  A    Yes.

20  Q    All right.  When you all first made contact with

21  Lorenzo Jackson's mother, was there some conflict between

22  her and local law enforcement?

23  A    Yes.

24  Q    Can you tell us about that?

25  A    She was very agitated with Houston PD and did not want

1  them really on the scene, which was my partner who I was

2  working with for this case.

3      So to calm the tension, I asked him to just step back a

4  little further off the perimeter and just hang tight while I

5  had some FBI agents up there with me.

6  Q    Okay.  To be very clear, did she state that she would

7  not cooperate as long as Houston Police Department was there

8  on the scene?

9  A    Yes.

10 Q    Once she was cooperative in speaking to you, did she

11 eventually agree to help you locate Nyreon?  Excuse me,

12 Lorenzo Jackson.

13 A    Lorenzo.  Yes, she did.

14 Q    And can you tell us how that came about?

15 A    We spoke for a while just about the case, about what

16 he's potentially involved in, and how, you know, she can --

17 he can help himself out if we -- if he wants to talk to us.

18 But we need to take him into custody and that we're not just

19 going to drive away.

20     Eventually, I had said, listen, we have a perimeter set

21 so I'm going to go on the -- we're going to go towards the

22 outermost part of the perimeter, and I'm going to wait for

23 you.

24     If you can get in touch with him within the next ten

25 minutes, I will standby for your phone call and then we'll

1  take him into custody that way, and a lot easier than us

2  trying to bring in a canine because that's what we were

3  trying to do and was to get canine to show up scene.

4      And then within matter of minutes of me leaving the

5  scene and going to the perimeter, she called me back and

6  said that he's over here behind a tree, bush area.

7      And she walked down the block, and that's when we took

8  -- that's when he came out from where he was hiding and we

9  took him into custody.

10 Q    All right.  Did you all have an opportunity to talk to

11 him afterwards?

12 A    Yes.

13 Q    During the course of that mirandized interview, did he

14 admit that he had been evading law enforcement that day?

15 A    Yes.  And that only came up because his mother was very

16 nice to me.  And we had a conversation about trying to like

17 get him to cooperate.  And he -- she assured that he would

18 cooperate and talk and do things of that nature.

19      So I thought during the interview, once I mirandized

20 him he would want to talk and help himself out.  And at that

21 point is when he said if I didn't want to -- something along

22 the lines if I didn't -- if I wanted to cooperate, I

23 wouldn't have ran.

24 Q    All right.  And I want to finally discuss the arrest of

25 Nyreon Tucker.  At the time of his arrest, was he still in

1  fact on an ankle monitor on bond?

2  A    Yes.

3  Q    Were you able to locate him at -- well, where did you

4  locate him?

5  A    I did not locate him.  It was the local law enforcement

6  located him.  Through the investigation they learned that

7  vehicle that he was driving -- that he drives, they located

8  that vehicle and they initiated a stop.  And that's -- and

9  he was taken into custody without incident.

10 Q    All right.  Once they had arrested him, were they able

11 to do a search of his vehicle?

12 A    Yes.

13 Q    And can you tell us what, if anything, was found

14 inside?

15 A    A handgun.

16 Q    And was that a loaded gun?

17 A    I believe so.

18 Q    And again I guess just to be clear, the six incidents

19 that we've discussed today in more detail, are these the

20 only incidents that these four gentlemen are connected with?

21 A    (No audible response.)

22 Q    Let me rephrase that just to --

23 A    Yeah.

24 Q    -- be real simple.  You mentioned that, for instance,

25 Lorenzo was connected to five of the 19 robberies.  The six

1  that we just described are not all five of those incidents;

2  is that fair?

3  A    Correct.

4         MS. COLLINS:  Okay.  Pass the witness, Your Honor.

5         THE COURT:  Mr. Gallagher, do you have questions?

6         MR. GALLAGHER:  Thank you, Your Honor.

7         So the first offense you discussed -- I represent

8  Mr. Kelley.

9              CROSS-EXAMINATION BY PHILIP GALLAGHER

10 BY MR. GALLAGHER:

11 Q    So the first offense you discussed involving Mr. Kelley

12 was May 29th, correct?

13 A    Yes.

14 Q    All right.  You discussed one previously but you --

15 A    Yes.  If you'd bear with me, I just want to make sure I

16 give you the --

17 Q    I just want to make sure I'm clear.

18 A    Yes.

19 Q    I'm not trying to rush you.

20 A    Yes.

21 Q    Great.  So in that, your understanding is that the

22 victim had taken a AirPods and a cellphone.  And was there

23 anything else?

24 A    The cellphone, just it was $26 in cash, in U.S.

25 currency.

1    Q    Was the -- has the cellphone that was taken ever been

2    recovered?

3    A    It has not.  And it was valued at a thousand dollars.

4    Q    Okay.  And so you said that a video -- the AirPods,

5    however, were recovered.

6    A    So there's a pawnshop video of them entering the store

7    and pawning some belongings.  The -- we have the receipt for

8    the AirPods which has a serial number that was just given to

9    us from the victim.

10   Q    Okay.  When was the -- when did they visit the

11   pawnshop?

12        (Pause)

13   A    Believe it was approximately June 2nd, 2023.

14   Q    Okay.  And you say on that video it's Mr. Kelley and

15   Mr. Johnson or is it Jackson?  I'm sorry, can I have it

16   back?

17        MS. COLLINS:  Yeah, sorry, Johnson.

18   A    Yes.

19   Q    Okay.

20        THE COURT:  Johnson or Jackson?

21   BY MR. GALLAGHER:

22   Q    It's Johnson, right?

23   A    Yes.

24   Q    Okay.  Thank you.  And you discussed various I guess of

25   course several of the robberies, various ATM videos, right?

JOE OPPEDISANO - CROSS BY MR. GALLAGHER

1   A    Yes.

2   Q    And I know you mentioned that you believe Mr. Ke Shaun

3   Johnson is in some of those, right, wearing a blue hoodie?

4   A    Yes.

5   Q    In any of the ATM videos is Mr. Kelley visible?

6   A    No.

7   Q    And I guess on the final incident you discussed

8   involving Mr. Kelley, --

9   A    The June 20th?

10  Q    Yes.  Sorry, let me -- now I need to keep up with you.

11  Yes, exactly.  That one --

12          THE COURT:  But --

13  Q    -- you believe there is a video that during the course

14  of the robbery that depicts Mr. Kelley; is that right?

15  A    Yes.  She was still being held at gunpoint and was not

16  free to leave.  They were at a gas station at one of the

17  pumps.

18      I don't remember which pump it was but we have the

19  video, several angles of the vehicle pulling up, and Kenneth

20  Kelley getting out and going into the store.  He actually

21  goes back and forth to the vehicle several times.

22  Q    So other than that video you just described, is there

23  any video of Mr. Kelley during the course of any of these

24  robbery events you described?

25  A    You mean like actually inside the vehicle; is that what

1  you're referring to?

2  Q    I'm trying to be a little broader than that.  I'm

3  saying -- you know, I'm putting aside the -- I'm trying to

4  separate out the pawnshop.

5  A    Okay.

6  Q    So either in the video with the people going to the

7  ATMs, you mentioned like there was some incident where there

8  were during the course of a robbery, I think this was on the

9  one prior to that June 20th, maybe June 7th.  No, I didn't

10  write down the dates of this.

11      But anyway, there was one you mentioned where during

12  the -- the victim was still in the car, you believed the

13  robbers actually committed other robberies, right?

14  A    Yeah.  So it --

15  Q    So I'm just asking while --

16  A    -- was June 13th.

17  Q    Yes.  So when did you say was that?  Sorry, June 13th?

18  A    June 13th was that one.

19  Q    But anyway, so I'm trying to be broader.  So during the

20  course of any of these actually ongoing robbery events,

21  other than that one video at the gas station you just

22  described, is there any video that depicts Mr. Kelley?

23  A    To my knowledge, no.

24  Q    And you said -- actually you mentioned several firearms

25  being found during the arrests of the various Defendants,

1  right?

2  A     Yes.

3  Q     Does that say -- so in the firearm in Mr. Kelley's car,

4  what type of firearm was that?  Actually let me restate that

5  question to be clear.  It wasn't Mr. Kelley's car, right?

6  So I'm asking about the firearm that was found in the

7  vehicle at the time of Mr. Kelley's arrest, right?

8  A     The June 20th stolen vehicle, is that what --

9  Q     Yes.

10  A     -- you're referring?

11  Q     Yes.

12  A     Okay.  And what's the question?  I'm sorry.

13  Q     So describe the firearm that was found; can you

14  describe it?

15  A     I mean, it was a semiautomatic handgun.  I don't know

16  which make or model that -- off the top of my head.  There

17  were several.  Like I said, there was several firearms that

18  were -- we -- that were taken in throughout the course of

19  the investigation so there's a lot of facts.

20  Q     All right.  Are you able to match that firearm as any

21  of the ones that was displayed in any of the robberies you

22  described?

23  A     No.

24  Q     And so the time Mr. Kelley was arrested --

25  A     Can I say something real quick?  Sorry.

1  Q     Sure.

2  A     The reason I said no for being able to match it is

3  because we have to send off DNA comparison from the subjects

4  that are in custody to get that analyzed with any DNA that

5  was from the weapon.

6        We actually have a search warrant for that as well to

7  initiate the swab, buccal swabs for the subjects here today.

8  So once we have that, then that will be sent off to the lab

9  for analysis.

10 Q     Okay.  So that might identify which persons held which

11 firearms, right?

12 A     Potentially, yes.

13 Q     Do you have -- and so I guess what I'm really trying to

14 figure out, though, is do you have any description or

15 pictures of the firearms used actually in the course of the

16 -- any of these particular robberies that even once you --

17 that you'll be able to match recovered firearms to

18 particular robberies?

19 A     The photo we have of the June 20th of Lorenzo Jackson

20 getting out of the vehicle, we can clearly see the firearm

21 in his hand, which the still shot would be able to identify

22 the -- one of the firearms.

23       However, because of the traumatic event with the

24 victims, they could only identify that it was just a big,

25 large, black or silver pistol that was presented to them.

1    Q    So does that picture of the June 20th firearm match any

2    of the firearms recovered so far in this investigation?

3    A    I'm not sure off the top of my head.

4    Q    And so Mr. Kelley was arrested I guess that's June

5    21st, right?

6    A    Yes.

7    Q    Okay.  Was there an arrest warrant out for him at that

8    time?

9    A    Yes.  There was a pocket warrant out for the State

10   side.

11   Q    And who was he with?  Was he with someone in the

12   vehicle at the time of his arrest?

13   A    Yes.

14   Q    Who's that?

15   A    Damarian Gatlin (phonetic).

16   Q    Okay.  And that person's not charged, right?

17   A    On the Federal side, no.

18   Q    Okay.  That person has charges on the State --

19   A    Originally he was charged on the State side but he has

20   not been charged on the Federal side.

21          MR. GALLAGHER:  May I have just one second, Your

22   Honor?

23          THE COURT:  You may.

24      (Pause)

25          MR. GALLAGHER:  Okay.  Thank you, Your Honor.  I

1  pass the witness.

2          THE COURT:  All right.  Let me see the order here.

3  Counsel for Mr. Johnson.

4          MS. PASTORINI:  Thank you, Your Honor.  May I

5  proceed?

6          THE COURT:  You may.

7            CROSS-EXAMINATION BY WINIFRED PASTORINI

8  BY MS. PASTORINI:

9  Q    Okay.  Let's talk about all the dead cases that are --

10 Federal cases that are filed and indicted against

11 Mr. Johnson, they are basically a refile of the State's

12 cases that are reflected in the pretrial release summary; is

13 that right?

14 A    I don't really understand what you're asking.  That

15 might be --

16 Q    Okay.  There's a bunch of --

17 A    -- a good question for my counsel.

18 Q    There were a bunch of cases listed in the pretrial

19 release documents that talked about the cases that were

20 filed in State Court.  You have -- you filed theses cases

21 initially in State Court, right?

22 A    I don't -- not me.  I don't have access to that.

23 That's going to be my TFO.  That's why we work on a joint --

24 Q    I'm not sure --

25 A    -- task force.

1  Q     You're going to have to help me.  So your TFO.

2  A     Task force officer who's --

3  Q     Okay.

4  A     -- assigned to my squad with the FBI.  So they're

5  attached to the squad.  That's a local partner with Houston

6  PD.  They -- he would file charges.

7  Q     He refiled the charges.

8  A     He filed the initial charges for the State.

9  Q     And then he -- those charges are refiled, indicted in

10 Federal Court.

11 A     I can't speak on his behalf on what he charged on the

12 State side.  I don't work for the State.

13 Q     Well, did you -- you got your information from the

14 State, did you not?

15 A     We get the police reports and the information for that,

16 and I build a Federal case.  And that's when I speak to my

17 prosecutor who's present today, who then we go through the

18 facts of that and determine what cases that she's going to

19 file.  Now, --

20 Q     And --

21 A     Go ahead.

22 Q     And you spoke with the prosecutor in the State cases;

23 is that right?

24 A     The -- my TFO did.

25 Q     Okay.  The TFO talked to them and saw their -- all the

1   cases they filed there.  And they -- it was decided that it

2   would -- those cases would be filed in Federal Court; isn't

3   that right?

4   A    I can't speak on that.

5   Q    Okay.  If you don't know -- do you know any cases that

6   are filed in State Court that are not filed in Federal

7   Court?

8   A    Again, I can't speak on that.  I don't work for the

9   State.

10  Q    All right.  Would it surprise you that there are none?

11  A    Again, I can't speak on that.

12  Q    All right.  The -- let's -- there was -- in none of

13  these cases that are filed here in Federal Court did the --

14  was the robbery committed with Mr. Johnson holding the

15  firearms; is that correct?

16  A    I don't know because the -- I don't know that answer

17  because the victim was in shock during the robberies and

18  there was multiple firearms at multiples incidences.  So the

19  victims, they --

20  Q    You don't --

21  A    -- don't know who the subjects were.

22  Q    Okay.  You don't have any case filed against

23  Mr. Johnson where he used or exhibited a deadly weapon;

24  isn't that the truth?

25  A    I can't say that he wasn't holding a firearm, but I

1   don't have anything that right now that we're talking about

2   that says that he was holding a firearm.

3   Q    Right.  That's --

4   A    Present.

5   Q    -- the whole --

6   A    Yes.

7   Q    -- point in my question.

8   A    Sure.

9   Q    You don't have any evidence that he was using or

10  exhibiting a firearm during the commission of any of these

11  robberies, do you?

12  A    No.

13  Q    Okay.  The next question, let's talk about going on --

14  we'll skip over to the arrest where there was a firearm in

15  the backseat of a car.  Who owned that car?

16  A    I do not know.  I wasn't present for that scene.  The

17  local law enforcement was dealing with that incident.

18  Q    It was on the backseat floorboard of the car, I think

19  you told this Honorable Court.

20  A    Yes.

21  Q    Okay.  So you're not -- you don't know if it was the

22  father's firearm or Mr. Johnson here that stands before the

23  bar of justice, or if it was a firearm that belonged to

24  someone else, do you?

25  A    I don't have that --

1   Q    Okay.

2   A    -- information.

3   Q    But my point is, you have no information such as even

4   eyewitness or fingerprints or things that would indicate

5   that that gun in the car was Mr. Johnson's, right?

6   A    No, I don't have that information.

7   Q    Okay.  And the same thing -- let's talk about was it --

8   was the car owned by his dad?

9   A    Again, I don't know that information.  I was not on the

10  scene.

11  Q    And his dad, who's out there in the courtroom, he's the

12  -- got his hand raised, he's not charged with anything, is

13  he?

14  A    No.

15  Q    And your criminal history shows he's never been

16  convicted of anything; isn't that a fact?

17  A    Which person are you referring to?

18  Q    The gentleman who raised his hand.

19  A    I did not run his criminal history so I do not know.

20  Q    So but he -- but you have -- you've no indication that

21  he's ever been convicted of the -- of any crime, felony or

22  misdemeanor, do you?

23  A    The father you're speaking about?

24  Q    Yes.

25  A    I do not know.  He's not part of the investigation so

1   he's not a subject of our investigation so I did not run his

2   NCIC --

3   Q    Okay.  He's certainly --

4   A    -- for that.

5   Q    -- part of the investigation because you told the Court

6   that he was with this -- that Mr. Johnson was with his

7   father, fishing at the time that you all arrested --

8   A    When we went --

9   Q    -- Mr. Johnson here -- excuse me -- seated behind me,

10  right?

11  A    When we went to go -- when they went to go arrest your

12  client, he was with his father, yes.  But his father was not

13  part of the investigation where we would run NCIC on the

14  Federal side.

15       Now, whatever State and local did to -- on their end to

16  see if he had any wants or warrants out for his arrest, I

17  don't -- I can't speak on that.  I wasn't present.

18  Q    And you are -- but let's talk about there's nobody --

19  as you said, you volunteered that everybody was shook up

20  about having a gun pulled on them.  I don't doubt that.

21       But there's nobody that said the guy in the blue jacket

22  pulled a gun on him, did they?

23  A    I can't -- I don't have that information off the top of

24  my head.  I'd have to go through all the instances.

25  Q    Okay.  Without going --

1  A    There's 19 of them so there's a lot of information that

2  -- and during the interviews and police reporting for me to

3  have that knowledge.

4  Q    Well, there's only six that applies to my client, as

5  far as I understand your testimony already; is that fair?

6  A    Well, the ones we're talking about today were the ones

7  that are charged.  But, again, there was 19 incidences that

8  had multiple people that we did not charge --

9  Q    Well, --

10 A    -- in that incident.

11 Q    Okay.  Well, if you --

12 A    But he's --

13 Q    -- had evidence that he was involved in other -- in

14 more than six robberies, you would have -- and there's only

15 really three robberies, and then three cases of enhanced

16 because it's there was a use or exhibiting of a federal --

17 excuse me, of a firearm; isn't that right?

18 A    Like what was stated earlier, there was -- we can tie

19 your client to five.

20 Q    To five --

21 A    Incidences.

22 Q    To five what?

23 A    Five reports, five incidences.

24 Q    Okay.  And in none of the five do you have any

25 indication that he ever used or exhibited a deadly weapon;

 1   isn't that the truth?

 2   A    I'd have to go through every single one of the HPD

 3   reports and review all the notes in order to talk about --

 4   Q    Well, let's --

 5   A    -- incidences that are not charged in this charging

 6   document today.

 7   Q    Let's talk about your present recollection as you sit

 8   here testifying at this hearing.  You don't have any

 9   indication that he used or he personally used or exhibited a

10   deadly weapon or you'd have told the judge that, wouldn't

11   that be a fair statement?

12           MS. COLLINS:  Objection to asked and answered at

13   this point, Your Honor.

14           THE COURT:  Yeah.  We -- you've gone over it.

15   There's an Indictment in the case.  He's indicted for aiding

16   and abetting, using and carrying a firearm or dangerous

17   weapon in relation to a crime of violence.

18           You've made your point about the amount of

19   evidence that there is to support it.  But I have an

20   Indictment on multiple counts.

21   BY MS. PASTORINI:

22   Q    But did you ever have any testimony from any of your

23   witnesses that the guy in the blue jacket used or exhibited

24   a firearm?

25           MS. COLLINS:  Objection, asked and answered, Your

1   Honor.

2           THE COURT:  Yes.  It's been asked and answered,

3   Ms. Pastorini.

4           MS. PASTORINI:  All right.

5   BY MS. PASTORINI:

6   Q    The next thing I'd like to know is that when he -- when

7   my client was arrested out at the fishing hole with his dad

8   -- I guess it was the fishing hole.  Where was the -- where

9   were they fishing?

10  A    I believe it was Seabrook, if my memory's served me

11  correct.

12  Q    Okay.  And he didn't make any -- he never attempted to

13  pull a gun on you or the people that arrested him, did he?

14  A    Again, I wasn't present.  But, no, he went into custody

15  without incident.

16          MS. PASTORINI:  Went into custody without

17  incident.  Okay.

18  BY MS. PASTORINI:

19  Q    Let's -- and then my client never -- you have no

20  indication from any of these victims that my client ever

21  attempted or did sexually assault any of them; isn't that a

22  fair statement?

23  A    Yes.  According to the -- yeah, that's a fair

24  statement.  Just his confession talking about him being

25  present during the sexual assault where he didn't stop

1  Kenneth Kelley from doing it.

2  Q    Okay.  He didn't stop somebody from doing it.  And but

3  you're not saying that he had anything -- he didn't

4  particulate in any manner in any sexual assault of anyone

5  during these robberies; isn't that a fair statement?

6  A    That's a fair statement.

7  Q    Okay.  And additionally let's talk about he didn't --

8  we don't -- you said you have no indication that he had a --

9  you don't have any recollection of him use the -- anybody

10 saying that the guy in the blue jacket used or exhibited a

11 weapon, no sexual assault.

12       Do you have any indication that he personally ever

13 threatened verbally any of the victims in this case?

14 A    I cannot speak on that just because the victims, again,

15 were in a situation that there was a lot of commotion going

16 on in the vehicle and multiple people talking and going

17 through that.  So I don't think they were able to decipher

18 which exact person said what.

19 Q    Well, in -- but --

20 A    They just heard the words of what --

21 Q    Just --

22 A    -- they were told about being threatened.

23 Q    Just a fair statement, because of whatever reason, you

24 have no indication that he personally threatened anyone;

25 isn't that a fair statement?

1  A    That's a fair statement.

2  Q    Okay.  The -- how did you all know that he would be at

3  the fishing hole in Seabrook or wherever it was?

4  A    Again, that was based -- so the way this works is we

5  divvy up which subjects we're going to go after.  We create

6  a team.

7       That team and that person that's in charge of that

8  operation, if you want to call it, would figure out all

9  those factors and conduct surveillance and do their own

10 thing while we were doing what we were doing.

11      So I was not, again, present for that or had knowledge

12 of how -- what they were doing to go and apprehend him.

13      I know that they located the vehicle down by the

14 fishing hole, if that's what you want to call it, and they

15 got eyes on your client and they wanted to take him into

16 custody, so they did.

17 Q    You said the vehicle; what do you mean the vehicle?

18 A    Like they got eyes on like the vehicle that I guess he

19 was potentially going to be in which was I believe his

20 father's, if that was his father's, which I don't know.

21 Q    Okay.  But make -- I want to make sure that we don't

22 leave a misimpression with this Honorable Court that you had

23 any indication that the vehicle that he and his father drove

24 to the fishing hole with was in any way tied to any of these

25 robberies.

1   A      No.

2   Q      You don't have any indication of that, do you?

3   A      No.

4   Q      That -- there's no indication that any of those guys

5   had any cars; isn't that a fair statement?

6   A      Which --

7   Q      There were --

8   A      -- guys are you talking about?

9   Q      The people that are charged with the robberies, that

10  are indicted in this case.  They were using Lyfts and Ubers,

11  right?

12  A      I mean, yeah, that's what the case was based off of,

13  aggravated robberies to --

14  Q      Right.

15  A      -- Lyfts and to Uber drivers.

16  Q      So you're not saying that the car at the --

17          THE COURT:  He did not say that the --

18  Q      -- fishing hole was his dad's.

19          THE COURT:  -- car was used in any of the

20  robberies.

21          MS. PASTORINI:  All right.

22  BY MS. PASTORINI:

23  Q      There's no evidence of Ke Shaun using any physical

24  restraint on any of the victims; isn't that a fair

25  statement?

1  A    If you considering not letting them go physical

2  restraint of a weapon, which I can't say he was holding or

3  not holding, but the victims were not free to leave the

4  vehicle.

5  Q    Well, yeah, but you never --

6  A    There was no confinements of like handcuffs or ties or

7  something, if that's what you're referring to.

8  Q    Zip ties or --

9  A    No.

10 Q    -- holding them down and not letting them leave or any

11 of that --

12 A    No.  There was no --

13 Q    -- stuff by my client.

14 A    -- evidence of that.

15 Q    Okay.  Did you ask that the gun that any of these --

16 the guns that recovered, did you ever ask that those guns be

17 printed, fingerprinted?

18 A    I believe they -- I think they're -- I believe they are

19 in the -- still in process of being printed.

20 Q    So at this point in time you have no proof of any --

21 that my client ever even touched a handgun; isn't that a

22 fair statement?

23 A    At this time, not yet, no.

24 Q    All right.  And on that sexual assault, there was --

25 that woman never said that anybody held her down and made

JOE OPPEDISANO - CROSS BY MS. PASTORINI

1  her do these things, --

2          THE COURT:  Okay.  Ms. Pastorini, --

3  Q    -- but somebody pulled a gun, right?

4  A    I mean, she was held at gunpoint while she --

5  Q    That's --

6  A    -- performed oral sex.

7  Q    That's what I just said, just asked a very -- I said,

8  other than the being held at gunpoint by Mr. Kelley, there

9  was no indication that anybody else held her down, is there?

10  A    No, not --

11  Q    Okay.

12  A    No.

13  Q    Just -- thank you.

14          THE COURT:  Just keep in mind we have two other

15  attorneys who need to ask questions of the witness.

16          MS. PASTORINI:  Thank you, Your Honor.  I will.

17  BY MS. PASTORINI:

18  Q    Are you aware that prior to the filing these charges

19  against my client, that he's never been charged with

20  anything in his life?

21  A    From his past criminal history, yes.

22          MS. PASTORINI:  And I think I'm about through,

23  Judge.  I just need to recheck my notes, if you don't mind.

24          THE COURT:  Okay.

25      (Pause)

1  BY MS. PASTORINI:

2  Q    I believe you talked about somebody -- oh, it was

3  Tucker that had the ankle monitor, right?

4  A    Yes.

5  Q    But my client didn't have an ankle monitor, did he?

6  A    No.  Just because, you know, you alluded that there was

7  no criminal history so I don't have any reason to believe

8  that she -- he had an ankle monitor on.

9            MS. PASTORINI:  Okay.  Good.  Thank you.

10           I believe I'm ready to pass the witness.  Thank

11 you, Your Honor.

12           THE COURT:  Thank you, Ms. Pastorini.

13           Counsel for Mr. Jackson.

14           MR. THOMAS:  Thank you, Judge.

15           Agent, good morning.

16           THE WITNESS:  Hey, how you doing?

17           MR. THOMAS:  I'm good.

18                CROSS-EXAMINATION BY LEWIS THOMAS

19 BY MR. THOMAS:

20 Q    Let me ask you about the arrest of Lorenzo Jackson.

21 You've said that you --

22 A    Sure.

23 Q    -- were at the -- actually at the residence that day

24 and participated in the execution of that arrest; is that

25 right?

1  A    Yes.

2  Q    When he was arrested, you said that that was in a

3  location by a tree pursuant to what mom had told you, right,

4  like he was behind -- near a tree or something like that,

5  that's how you all found him?

6  A    Yeah.  His mother had no idea where he actually ran off

7  to.  We just -- she knew he obviously ran because we came to

8  the house and told her like, hey, we have an arrest warrant

9  for your son, we're looking for him, I need you to call him.

10      I think she tried several attempts and his phone was

11  off at that time or not going through.  And then I had asked

12  -- I told her the importance of what's going on with the

13  investigation because she had no clue of any of this that

14  was happening.

15      And then that's when she had -- after a long talk and a

16  while had passed of us trying to search for him, she -- I

17  had said we'll move back towards the perimeter, if you can

18  just try and find him.

19      If not, within ten minutes we'll have canine and we're

20  going to end up like coming in and trying to use canine to

21  try and track him down.

22      And that's when within, I don't know, a matter of

23  minutes of me moving back to the perimeter is when she

24  called and said he's on this block, you can come over here,

25  just let's do it peacefully, let's try and not make -- you

1  know, and I said that's fine, let's just have him come out

2  and surrender.

3      And that's what happened.  We ended up going over

4  there.  And he came out from behind the tree and bush area

5  and was taken into custody without incident.

6  Q    So I guess what I'm trying to figure out is that mom

7  basically helped you all lead law enforcement to where

8  Mr. Jackson was.

9  A    Yes.

10 Q    Okay.  Did he have a phone when he was taken into

11 custody?

12 A    No.

13 Q    Okay.  He left the -- we watched him leave the house

14 with a phone.  He did not have a phone on him during the

15 time of his arrest.

16 Q    And I recall you testified earlier that you believed he

17 had what appeared to be a firearm on his person as he left

18 the residence.

19 A    Yes.  We did not see the physical firearm.  We saw the

20 outlining of what we believed was a firearm just based off

21 our training and experience.  But we don't have any proof

22 that that actually occurred.

23 Q    Okay.  And that's what I was going to ask.  So as you

24 were establishing your perimeter at your scene there, were

25 -- I assume the efforts were made to try to locate what

JOE OPPEDISANO - CROSS BY MR. THOMAS                    66

1  might have been in his possession.

2  A    Yes, we did.  There was several residents that were not

3  home, not to go into their obviously backyard onto their

4  dwelling, so we could not get back there.

5  Q    Okay.

6  A    But efforts were made to look for and locate the phone

7  and/or gun that we believe we saw in his pocket of his

8  sweatshirt or pants.

9  Q    And you mentioned that he had left in the vehicle.  Was

10 that vehicle ultimately searched once the driver was

11 cooperative with your investigation?

12 A    It was not searched.  The -- that individual was let go

13 because he was cooperative and he gave us -- told us -- he

14 acknowledged who was there and was able to acknowledge there

15 was a second person when he originally said there wasn't.

16 So he was let go of there.

17     I -- it was not searched.  I -- there was I believe

18 just a cursory look on the outside to make sure there was no

19 weapons in plain view.  But nothing was found.

20 Q    Thank you.  Now, I kind of wanted to ask, you mentioned

21 earlier that -- and I think it was just described by the

22 prosecutor is he was fleeing the house.  Was he contacted

23 directly before this date to let him know that charges had

24 been filed and that he needed to turn himself in?

25 A    No.

1  Q    Okay.  With regards to the -- you mentioned there was

2  two -- well, you described two incidents specifically today

3  with regards to Mr. Jackson.

4      The June 20th incident you mentioned at a gas station

5  there's a video of him exiting I believe the complainant's

6  vehicle; do you recall that?

7  A    Yes.

8  Q    Okay.  Have you personally witnessed that video, like

9  you can --

10  A    Yes.  I personally watched that video.

11  Q    And --

12  A    And actually at 10:59 p.m. is when he exits the vehicle

13  on the back right side of the passenger vehicle.

14  Q    And is his face clearly identifiable in the video?

15  A    Yes.  He has a hood on and he exits the vehicle with a

16  weapon displayed where you can actually see the weapon.  And

17  he gets out and then proceeds to get in the front.

18      And that's when Kenneth Kelley had came back to the

19  vehicle after she had departed the vehicle to go lock

20  herself in the restroom until police arrived or until

21  somebody helped her out.

22  Q    Okay.  And my understanding is Kelley is the one --

23  he's arrested in that vehicle the following -- or fleeing

24  from the vehicle that following day.  Is --

25  A    Yes.

1  Q    -- that right?  Okay.  And my client wasn't with him

2  that next day.

3  A    The next day, no.

4  Q    Okay.  On the June -- the earlier incident, the June

5  13th, --

6  A    June 13th.

7  Q    -- I believe you mentioned that he was identified in a

8  photo array by the complainant; is that right?

9  A    Yes.

10 Q    And you mentioned that there's I believe tower, cell

11 tower information --

12 A    Cell phone presence.

13 Q    -- connecting him.  Was that information that you

14 gathered through I guess a subpoena or grand jury subpoena

15 or something like that, or how did you get --

16 A    The data --

17 Q    -- that information?

18 A    -- are you speaking of?

19 Q    Yes.

20 A    It was through a search warrant for data location

21 between certain dates, which then provided enough data where

22 that it would all have to be mapped.  And that specific date

23 populated for cellphone presence.

24 Q    Thank you.  You mentioned in the course of your

25 investigation that you would run NCIC on these -- the

1  gentlemen that are here that are charged in this case; is

2  that right?

3  A    Yes.

4  Q    Okay.  And it's true that Mr. Jackson has no prior

5  criminal convictions; is that right?

6  A    Correct.

7  Q    And in the course of your leadup to the arrest, you are

8  aware that he resided in Houston, Texas with his mom and

9  dad, right?

10  A    Yes.  His sister lives there as well, who is dating

11  Damarian Gatlin, who was part of the arrest on the 21st and

12  that stolen vehicle.

13  Q    Okay.  But as far as you know, he's a lifelong resident

14  of Houston, to the information that you have.

15  A    I don't know if he was a lifelong resident.  I just

16  know he lived at that location.  So I --

17  Q    I mean, if you were going to find somebody, one of the

18  things you would do as a member of law enforcement is to run

19  like a clear report or some kind of report to determine his

20  residence history, fair?

21  A    Fair, sure.

22  Q    Okay.  Did you find anything that indicated that

23  Mr. Jackson had ever lived outside of the Houston area?

24  A    No.

25          MR. THOMAS:  Judge, I'll pass the witness.

 1              THE COURT:  Thank you, Mr. Thomas.

 2              Ms. Shields.

 3              MS. SHIELDS:  Just a few questions, Your Honor.

 4              THE COURT:  All right.

 5                 CROSS-EXAMINATION BY JUDITH SHIELDS

 6   BY MS. SHIELDS:

 7   Q    Special Agent, the date of the arrest of Mr. Tucker,

 8   what was that date?

 9   A    I believe it was June 15th.

10   Q    Of 2023?

11   A    Yes.

12   Q    And you were not present on that team; is that correct?

13   A    no, I was not.

14   Q    Okay.  But you're familiar with the details of it to

15   some degree.

16   A    Some degree.  I wasn't present on that.  I just know

17   that he was taken into custody, and there was another

18   individual present, a juvenile.

19   Q    Okay.  So there was somebody else in the car.

20   A    Yes, I believe so.

21   Q    Okay.  Was that person arrested for anything, to your

22   knowledge?

23   A    Not that -- during that incident, while he was

24   arrested, my -- if my memory serves me correctly, I believe

25   he was arrested because of the firearm in the presence of

1  him.  He had a firearm.  So I think he was taken into

2  custody for that but not for this specific --

3  Q    To these related --

4  A    -- charges, yeah.

5  Q    -- charges.

6  A    Correct.

7  Q    So the juvenile was arrested for the presence of the

8  firearm charge.

9  A    I believe so, yes.

10 Q    Okay.  And Mr. Tucker's phone, I believe you said

11 earlier that you had run warrants for everyone else's phone.

12 Have you still not run any warrants for Mr. Tucker's phone?

13         THE WITNESS:  Give me a -- just give me one

14 second, please.

15         MS. SHIELDS:  No problem.

16     (Pause)

17         THE WITNESS:  So the information that we ran for

18 his phone was the CDR search warrant for the data location

19 of the phone number.  But the physical phone, if that's what

20 you're alluding to, no.

21 BY MS. SHIELDS:

22 Q    Did you ever recover his physical phone?

23 A    No, I do not believe so.

24         MS. SHIELDS:  I'll pass the witness, Your Honor.

25         THE COURT:  Thank you.  Any redirect, Ms. Collins?

 1              MS. COLLINS:  No, Your Honor.

 2              THE COURT:  All right.  You may step down.

 3         (Witness steps down.)

 4              Are there any other witnesses for the Government?

 5              MS. COLLINS:  No, Your Honor.

 6              THE COURT:  Mr. Gallagher, do you have any

 7  witnesses?

 8              MR. GALLAGHER:  No witnesses, Your Honor.

 9              THE COURT:  Okay.  Are you going to make a

10  proffer?

11              MR. GALLAGHER:  Only the one I referred to

12  earlier, that I'd been in contact with Mr. Kelley's mother

13  who he had stayed with part of the time prior to his arrest

14  11 months ago, and that she is willing to be a third party

15  custodian, and that she is willing to have him in the house.

16              THE COURT:  Okay.  Thank you.  And was he living

17  there prior to his arrest in --

18              MR. GALLAGHER:  She advised that he was partly

19  living -- he had been living with her part of the time.

20  He'd also been living with a family member who was expecting

21  a child, and so he was splitting time somewhat prior to his

22  arrest.

23              THE COURT:  All right.  Thank you, Mr. Gallagher.

24              All right.  Ms. Pastorini, do you have any

25  witnesses?

1          MS. PASTORINI:  Judge, I have -- I could make a

2    proffer in the interest of time and it not take to long.

3          THE COURT:  Okay.

4          MS. PASTORINI:  But if you prefer, I do have his

5    father here, and his father's wife, which is not his mother.

6    But they -- he's here.  He has -- he's never been convicted

7    of any crime, felony or misdemeanor.

8          He would allow -- if you were to allow this young

9    man to be placed on supervised release, he would allow him

10   to live in his home.  He would watch him 24, seven.

11         He goes to work every day as a local deliveryman

12   on a -- with an 18-wheeler.  He never leaves the

13   jurisdiction of Harris County but he does drive locally.

14   And he would have -- make sure that his son went with him

15   everywhere if that was the ruling of the Court.

16         He would -- he's got a wife now, I guess it's a --

17   I don't know if it's a girlfriend or his wife, but they've

18   been together in a committed relationship for a number of

19   years.  And if ever he had to go anywhere that he couldn't

20   take his son, his wife would be the -- able to be there with

21   the young man in the house.

22         They have -- he has no objection to electronic

23   monitoring and any other restrictions that you might put on

24   him in order to grant him supervised release.

25         And, Judge, I don't know, I think I did prove up

1  that he has no criminal history, and I wanted to just

2  reiterate that.  I didn't know if I did or not.  But the

3  proffer, I think the --

4           THE COURT:  I've taken judicial notice of the

5  Pretrial Services report.  There aren't --

6           MS. PASTORINI:  That's all I have to say.

7           THE COURT:  -- any convictions on it, just other

8  charges.

9           MS. PASTORINI:  I thank you, Judge.  That's all I

10  have to say.

11           THE COURT:  Thank you, Ms. Pastorini.

12           Mr. Thomas.

13           MR. THOMAS:  Judge, we have no witnesses.  I

14  didn't know if you want to hear argument now or reserve that

15  until the end.

16           THE COURT:  I'm going to reserve that to the end,

17  so --

18           MR. THOMAS:  Thank you, Judge.

19           THE COURT:  -- any evidence other than --

20           MR. THOMAS:  The only thing I'd make -- I'd ask

21  the Court to consider the information in the Pretrial

22  Services report.

23           In addition, I did make contact with his -- with

24  my client's girlfriend who indicated that he would be

25  allowed to stay with her in the Houston -- in Houston if the

1   Court granted bond.  And that would be our proffer.

2          THE COURT:  Thank you, Mr. Thomas.

3          And Ms. Shields.

4          MS. SHIELDS:  Your Honor, I would just have a

5   proffer.  Mr. Tucker's mother is present.  But I've also

6   spoken with his father.  They live together in Manvel.

7          Mr. Tucker is welcome to come back to the home.

8   They are both willing to be third party custodians if

9   approved by this Court, with a request or an understanding

10  of home confinement would most likely be the term of

11  release.  And they agree with that.

12         THE COURT:  Thank you.  All right.  I'm ready for

13  argument.

14         MS. COLLINS:  Yes, Your Honor.  Your Honor, I'd

15  ask that you take consideration of a few things.

16         First of all, the degree of the complexity of the

17  underlying offenses.  These are not quick-hit robberies, in

18  and out, or onetime quick-hit robberies.

19         This is a series of aggravated robberies in which

20  each of these Defendants on more than one occasion

21  participated in holding and kidnapping, holding hostage Uber

22  and Lyft drivers for a period of time, literally driving

23  around with them in the vehicle, taking them to multiple

24  locations, again, all while holding them at gunpoint, to

25  steal thousands of dollars worth of money, goods, and cash

1   from these victims.

2          I understand the Court's concern about the age of

3   these individuals and probably the lack of criminal history

4   for most of them.  But I do not think that negates the

5   seriousness of the underlying offenses.

6          I'd also take into consideration the fact that at

7   a young age, we can all see making a mistake one time,

8   walking away, realizing what we've done, and saying, wow,

9   that was a bad idea, I'm not ever going to do it again.

10  That does not represent any of the Defendants that are

11  sitting in front of you.

12         All of them went through the process of

13  kidnapping, holding hostage, and robbing these victims, and

14  then chose to do it again and again and again, up to eight

15  times by one of these men, Kenneth Kelley.

16         And I would also argue, Your Honor, that as these

17  cases go along, the seriousness of the offenses increases.

18  We know that after several times of committing these

19  robberies, Kenneth Kelley and Ke Shaun Johnson participate

20  in another robbery in which a woman is sexually assaulted.

21         And defense counsel has stated that somehow I

22  guess implied that Ke Shaun Johnson has some kind of less

23  credibility in that fact just because he wasn't the one

24  committing the sexual assault.

25         But I want the Court and ask the Court to take

1   into consideration the type of individual who continues to

2   rob and ride around with a woman while she's being sexually

3   assaulted by another individual.  That is Ke Shaun Johnson.

4   That is what he is capable of.

5          And, Your Honor, I'd also ask you to take into

6   consideration that we're talking about Uber and Lyft

7   situations.  These are situations where people are literally

8   going -- these victims are going to the homes, going to the

9   apartment complexes of these Defendants.

10          Even if there was location monitoring, even if

11   they were under home confinement, it would not prevent these

12   types of victims from being ordered and called out to these

13   individuals' homes in a time that there is nothing that this

14   Court or law enforcement would be able to do to prevent

15   these offenses before they were actually committed.

16          In addition, Your Honor, Kenneth Kelley

17   specifically is seen riding around in one of the stolen

18   vehicles.  He flees from law enforcement.  He is taken into

19   detention.

20          However, again, they find a loaded gun, a series,

21   a repeating series, if you will, of facts in this case.

22   He's found with a loaded gun after fleeing from police.  The

23   same with Ke Shaun Johnson.

24          Again, my concern, Your Honor, is, one, defense

25   counsel's made mention of the Defendant's father.  I would

1   first point out that that individual has not been run or

2   reviewed by Pretrial Services.

3           Nonetheless, what we do know is that he is willing

4   to have a firearm in plain view in a vehicle with his son at

5   the time that he is in fact arrested, Ke Shaun is arrested,

6   a loaded weapon.

7           Again, and with all of these families, I'm sure

8   they're all good people, Your Honor.  But these Defendants,

9   all four of them, were on -- in some degree living with

10  their families at the times they were committing multiple

11  robberies.

12          Despite what I'm sure was best efforts by each of

13  these families to prevent their sons from committing these

14  crimes, they were unable to do so.

15          In addition, we know that Lorenzo Jackson's

16  mother, when she's approached, will not cooperate with local

17  law enforcement.  They literally have to have HPD leave the

18  scene in order for her to even speak to the FBI agent in

19  this case.

20          And once she does, I certainly agree that she then

21  cooperates with the FBI agent helps them find her son.

22          But that's only because her son has fled.  He has

23  seen law enforcement there and he has fled the scene,

24  ditching a firearm and a cellphone in the process, evidence

25  of his crimes.

1           And, again, we then get to Nyreon Tucker who is on

2    bond for another aggravated robbery when he is found in

3    possession of a loaded gun while he's also committing these

4    new offenses.  He has made clear through his actions that he

5    will not abide by any rules that are put in place by a

6    court.

7           Your Honor, the complexity of these offenses, the

8    number of these offenses, the seriousness of these offenses

9    alone shows the danger to community that each of these

10   individuals can have if they are released.

11          In addition, I would again repeat to the Court

12   that these are all individuals that are being asked to go

13   back to exactly where they came from, to exactly the same

14   homes that were unable to prevent them from committing these

15   crimes, to the same homes where these Uber and Lyft drivers

16   were often called to become victimized.

17          And each of them in their own way have -- Kelley,

18   Lorenzo, Nyreon, have all at some time fled from law

19   enforcement showing again flight.

20          I do not believe, and I would submit to this

21   Court, that there is no condition or combination of

22   conditions that would prevent them from being a danger to

23   the community.

24          And, further, I would argue that at least Kenneth

25   Kelley, Lorenzo Jackson have shown that they are also a

1   flight risk in this community.

2          That's all, Your Honor.

3          THE COURT:  Thank you, Ms. Collins.

4          Mr. Gallagher.

5          MR. GALLAGHER:  Thank you, Your Honor.

6          Can I steal that?

7          THE COURT:  And can you -- and for each defense

8   counsel, I would like in your argument for you to tell me

9   exactly the evidence that you are relying on to rebut the

10  presumption of danger to the community.

11         MR. GALLAGHER:  Yes.  And so for Mr. Kelley, as I

12  think I alluded to earlier, I think the -- regarding the

13  risk of flight, I think the evidence regarding his

14  connections to the community are clear from the Pretrial

15  report, so I won't go into those further.

16         His -- regarding the danger to the community, he

17  is a young man.  He has not previously been convicted.  He

18  has a stable place to live.

19         He -- the Court has available to it quite strict

20  conditions that will mitigate those concerns.  Those aren't

21  always true.  The Court sometimes doesn't have those for

22  people who are homeless, don't have a stable residence.

23         Those things are true for Mr. Kelley.  So, for

24  instance, with an ankle monitor, that would make sure that

25  if Mr. Kelley leaves his home without permission, that would

1  be known.

2          There's no reason to think that he's of any harm

3  to anyone when he's inside his home.  And as soon as he

4  leaves his home without permission, he would be in violation

5  of the Court's orders and would be brought back into custody

6  quite quickly.  And the consequences hanging over his head

7  for that are significant.

8          So the penalties for violating the Court orders,

9  the strict conditions that the Court can impose with

10  reliable monitoring I think mitigate or prevent the

11  Government from showing by clear and convincing evidence and

12  that he -- that the Court cannot set conditions that will

13  ensure the safety of the community.

14          And as the Government has mentioned, this is --

15  there is a series of events and the Court -- there are

16  serious concerns obviously.  There's no dispute about any of

17  that.

18          But that said, Mr. Kelley's not someone who's in

19  violation of court orders before.  He is not someone who has

20  failed to appear for any court proceedings.  He is not

21  someone who has an unstable background.

22          And so all those factors show that the Court can

23  indeed set conditions that will prevent -- ensure the safety

24  of the community, Your Honor.

25          THE COURT:  Thank you, Mr. Gallagher.

1          Ms. Pastorini, again, I want to know exactly what

2    evidence you're relying on to rebut the presumption of

3    danger to the community.

4          MS. PASTORINI:  All right.  Thank you, Judge.

5          One thing I want to point out initially is that

6    with the father with no criminal convictions at all, it

7    would not be unusual for a man to go to a fishing hole and

8    take a gun in case he was -- had issues with snakes, if this

9    is south Texas.

10          There's no evidence that my client ever touched

11   that gun or knew anything about it being in -- on the

12   floorboard in the backseat of the car.

13          The next thing I want to point out is he didn't

14   live with his father when this took place.  He was living

15   with his mother who lived and operated north of town, as

16   reflected in that presentence investigation thing.

17          She would not be the custodian.  We would not --

18   we're not asking that that be done.  We're asking that the

19   third party custodian be his father, who is in a stable

20   relationship, fully employed, who drives locally a delivery

21   service here in Houston.

22          Electronic monitoring would certainly -- he's not

23   shown any sign that electronic monitoring would not be a

24   beneficial tool to the Government to keep tabs on if and

25   where he is.

1          He's -- the dad is -- the dad lives here inside

2    the City of Houston, and that would be certainly an easy

3    thing to do is to make that electronic monitoring an

4    important thing to have there.

5          He -- there's not -- I asked repeatedly about

6    there -- what did my client -- is there any evidence that he

7    ever possessed or had a gun or used a gun.  And I'm not

8    minimizing it just because it -- that he didn't.

9          But there's no evidence from anyone that he used

10   the -- he used or possessed a deadly weapon during any of

11   these things.

12         The fact that -- and there were two people in the

13   car when this poor woman was sexually assaulted.  But I want

14   to point out one thing.  My -- there's no evidence that this

15   man put on in the -- in his testimony that showed that my

16   client did anything to assist in the sexual assault

17   committed by --

18         THE COURT:  He drove the car while the sexual

19   assault was occurring.  He was the driver of the car.

20         MS. PASTORINI:  But he didn't -- okay.

21         THE COURT:  Okay.  All right.

22         MS. PASTORINI:  All right.  That was --

23         THE COURT:  I hear you.

24         MS. PASTORINI:  -- just my position on that,

25   Judge.

1          THE COURT:  Okay.

2          MS. PASTORINI:  But he's -- I just wanted to say

3  that -- I wanted to point that out, I guess, I don't know.

4          There's -- I don't see any -- and I want to point

5  out, though, Judge, that of all that testimony, there was no

6  evidence, no nothing brought up that my client ever

7  possessed a gun or used it in any way, other than as it

8  would be in law of parties with Mr. Kelley having done so.

9          But, Judge, I just think the fact that has no ever

10  -- there's not even a juvenile or delinquent testimony in

11  that the sentencing -- the PSI -- I mean the presentence

12  report that was here, it was not pointed out that there were

13  anything that he would do that would make him in any way a

14  flight risk.  He has nowhere to go.

15          His mother lives in Humble area, and his father

16  lives here in Houston.  And, anyway, I just ask that he be

17  granted with restrictions the right to return to his home

18  and honor the demands of the Court.

19          THE COURT:  Thank you, Ms. Pastorini.

20          Mr. Thomas.

21          MR. THOMAS:  Thank you, Judge.

22          With regards to the danger to the community, my

23  client does have no criminal convictions whatsoever.  He is

24  a resident of Houston, lifelong, and has family and a

25  girlfriend to support him.

1        Certainly we understand the allegations in this

2   case are serious, and the Court takes them seriously.

3        The evidence proffered by the Government doesn't

4   demonstrate how my client used a firearm in any particular

5   manner.

6        Certainly there is evidence him possessing one in

7   the video that's described, but not anything particular as

8   to like an identification by any witness to my client

9   displaying or brandishing a firearm with regards to any

10  particular complainant.

11       Judge, we would ask that the Court set conditions

12  of home confinement with ankle monitoring in this case as a

13  sufficient condition to protect the public, as well as the

14  complainants.  And that would be our request, thank you.

15       THE COURT:  Thank you, Mr. Thomas.

16       Ms. Shields.

17       MS. SHIELDS:  Your Honor, as to Mr. Tucker, there

18  is only evidence presented for -- that Mr. Tucker was

19  involved in one incident and as opposed to some of the co-

20  Defendants in this situation.  I want to make that clear.

21       And he's only indicted in one count.

22       And when they talked about the arrest, while there

23  was a gun found, the juvenile who was also present in the

24  car was arrested for that firearm.

25       There was no evidence that Mr. Tucker at any point

1  in time during that incident was in possession of that

2  weapon.

3          And he cooperated with the arrest.  And even

4  though he does have prior arrests, no convictions, there's

5  no indication that he's ever tried to flee or evade law

6  enforcement in any way.

7          The evidence I believe that shows that the -- he

8  can -- the community would be adequately protected comes

9  from the Pretrial Services report.

10          He has no prior convictions.  His connections are

11  completely to the community.  His family lives in Manvel.

12  His mother lives in Manvel.  His father lives within that

13  home.  He has siblings there that he's very close to.

14          They've both said that he can live in that home.

15  They are both willing to be screened by this Court to see if

16  they would be -- meet the standards for a third party

17  custodian.

18          And they both agree that a home confinement with

19  GPS, if that's what ordered by the Court, that he would not

20  be allowed to leave the home.  They would make sure that he

21  didn't leave the home.

22          And obviously an active GPS would alert if he

23  chose to violate that in any way.

24          We believe that those conditions would be adequate

25  to show the community would be protected if he was released.

1          THE COURT:  Thank you, Ms. Shields.

2          All right.  I'll start with Mr. Tucker.

3          Mr. Tucker, I find that the United States has met

4    -- well, as to all Defendants, I believe that the United

5    States has met its burden to show by clear and convincing

6    evidence that there are no conditions that can reasonably

7    assure the safety of the community.

8          My reasoning as to each Defendant differs

9    slightly.  But in large part my decision is based on

10   multiple repeated -- with the exception of Mr. Tucker, who's

11   charged in two counts in the Indictment, one for the

12   interference with commerce by robbery, and one for the use

13   or brandishing if a firearm in connection with that robbery.

14         Everyone else is charged or I heard evidence today

15   is involved in multiple robberies that include threats to

16   victims, putting weapons, pointing weapons to victims.

17         I heard testimony about one incident which

18   involved the victim taking hold of the firearm to point it

19   to the ceiling, crashing a car.  These are not just simple

20   little incidents that any one person made a mistake or two

21   mistakes.

22         These are multiple, consistent, repeated dangerous

23   robberies, putting victims in danger, and threatening

24   victims.  And then you add on top of that the incident

25   involving Mr. Kelley and I believe it's Mr. Johnson with the

1  sexual assault.

2          Clear to me all of this is clear and convincing

3  evidence that there are no conditions that I can impose that

4  would reasonably assure the safety of the community.

5          Again, we don't have any interviews with Pretrial

6  Services to qualify people as third party custodians.

7          But as pointed out by the Government in argument,

8  these individuals are being asked to return to the same

9  homes that they were living in at the time that these

10 incidents occurred, perhaps with the exception of

11 Mr. Johnson.

12          I don't have any information regarding

13 Mr. Johnson's father.  Everything in the Pretrial Services

14 report is about him working for his mother's trucking

15 business.

16          The -- with respect to Mr. Tucker who, again, is

17 charged in two counts, he was on a GPS monitor on bond when

18 these counts that he's charged with took place.

19          So there's no doubt in my mind that there are no

20 conditions with respect to Mr. Tucker that I could impose

21 that would reasonably assure the safety of the community.

22          As to Mr. Kelley, the testimony that he was

23 involved in at least eight robberies, all of these robberies

24 are alleged to have involved the use of a weapon,

25 threatening a victim, pointing a weapon at the victim.

1          And then there's the incident involving the sexual

2    assault.  To me, that is evidence that is clear and

3    convincing that there are no conditions that I can impose

4    that would reasonably address the safety of the community.

5          With respect to Mr. Johnson, again involved in,

6    according to the testimony, five robberies, and acted as the

7    person who was driving the car while someone was being

8    sexually assaulted in the car.

9          And I heard testimony about what was said to the

10   victim of the sexual assault.  And Mr. Johnson was in the

11   car, present.  And, you know, he's charged with aiding and

12   abetting in all of these counts.

13         I -- the testimony with respect to Mr. Johnson is

14   clear and convincing that when you're willing to participate

15   in something like that, I don't believe that there are

16   conditions that I can set that are going to prevent or

17   reasonably address the danger to the community.

18         And with respect to Mr. Jackson, there's testimony

19   that he is involved in five of these robberies.  There is

20   additional evidence, video evidence tying him to the

21   robberies, which is an argument that's not available

22   necessarily to all of the other Defendants.

23         He's -- all of the Defendants are unemployed.  All

24   the Defendants, except Mr. Johnson, are asking to go back to

25   places that they have previously resided while these

1   offenses were being committed.

2          And Mr. Jackson was involved in the situation

3   where clearly the victim managed to escape by going in,

4   locking herself in a restroom.

5          And I believe -- I can't recall if it was

6   Mr. Kelley that the video showed having the weapon.  But

7   clearly Mr. Jackson is in the car, there is a weapon

8   present, there are threats to victims.

9          Victims are forced to ride around, victims are

10  forced to give information about their debit cards.  They're

11  -- make transfers on their phones into putting money into

12  other accounts that these Defendants are alleged to have

13  then had available to them.

14         I mean, again, five different times, five

15  occasions threatening witnesses.  I believe that this is all

16  clear and convincing evidence that there aren't conditions

17  that can reasonably address the safety of the community.

18  It's largely based on the testimony describing the events.

19         It is unusual to have Defendants without prior

20  criminal histories other than charges on related State

21  charges.  But the conduct is extreme.  The conduct is

22  dangerous.  The conduct involves multiple threats to

23  multiple people on multiple occasions; involves weapons,

24  loaded weapons.

25         And I find based on the testimony that I've heard

1  today that there aren't any conditions that I can set that

2  can reasonably assure the safety of the community.

3         So I am having the Defendants remanded to the

4  custody of U.S. Marshals.

5         Is there anything else that we need to address?

6         MS. COLLINS:  No, Your Honor.

7         MR. GALLAGHER:  No, Your Honor.

8         MS. PASTORINI:  No, Your Honor.

9         MS. SHIELDS:  No, Your Honor.

10        MR. THOMAS:  No, Judge.

11        THE COURT:  All right.  Thank you.  You're all

12  excused.

13     (Proceeding adjourned at 11:54 a.m.)

14                    * * * * *

15        *I certify that the foregoing is a correct*

16  *transcript to the best of my ability produced from the*

17  *electronic sound recording of the proceedings in the above-*

18  *entitled matter.*

19  */S/ MARY D. HENRY*

20  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

21  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

22  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

23  *JTT TRANSCRIPT #69818*

24  *DATE FILED:  JUNE 17, 2025*

25